# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

DANIEL ZAMORA and CGC, INC.

                Plaintiffs,            :

                    v.                                 Demand for Jury Trial

JP MORGAN CHASE BANK, N.A.,
JPMORGAN CHASE & CO.,
FIT INTERNATIONAL GROUP CORP.,
FOREX INTERNATIONAL TEAM INC.,      :
JAIRO ENRIQUE SANCHEZ, and
DILIA MARGARITA BAEZ,

                Defendants.

---------------------------------------------------------------x

## COMPLAINT

      Daniel Zamora and CGC, Inc. (collectively, the "Plaintiffs") file this complaint against defendants, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., (collectively, "JPMorgan") FIT International Group Corp., Forex International Team Inc., (collectively, the "FIT Entities") Jairo Enrique Sanchez, ("Sanchez") and Dilia Margarita Baez ("Baez"). Plaintiffs bring this action for wire fraud, money laundering, racketeering, aiding and abetting fraud and other claims based upon JPMorgan's criminal recklessness. JPMorgan had actual knowledge or at a minimum consciously avoided the knowledge of and participation in such wrongs committed by Baez, Sanchez, by others known and unknown who conspired to perpetrate an enormous fraud and money laundering scheme through which Baez and Sanchez stole and diverted at least 150 million dollars from numerous victims. Plaintiffs allege the following upon personal knowledge as to themselves, their own acts and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys. Plaintiffs believe that substantial

additional evidentiary support will exist to support the allegations set forth herein, after a reasonable opportunity is made for discovery.

## I.    NATURE OF ACTION

1.      Baez and Sanchez, through the entities of FIT International Group Corp., Forex International Team, Inc., Bull & Bear Investment Corp., Semar International S.A., Jesmar Panama S.A., and Gimnasio Campestre George Berkerley committed a 150 million dollar money laundering and embezzlement scheme. On information and belief, $3,135,000.00 of investors funds were invested in the Forex market made through a third party, Capital Market Services LLC, which was subsequently taken over by Gain Capital. The $3,135,000.00 evaporated with Capital Market Services. The bulk of investor monies were laundered to shell companies that are under the control and direction of Baez, Sanchez and their cohorts in Colombia. The shell companies purchased real property in attempt to layer the laundered monies to aid in avoiding detection and to put any satisfaction of a foreign judgment out of reach through Colombian law. Baez and Sanchez used customer money to sustain the money laundering and embezzlement scheme by paying existing customers as they requested redemptions and for their own use.

2.      JPMorgan enabled the fraud, was at the very center of money laundering scheme and was thoroughly complicit therewith. JPMorgan should have known their "small business client" and exercised criminal recklessness by failing to do so. Upon information and belief, JPMorgan had actual knowledge of the laundering scheme through their employee, Yolanda Santiago-Hasbu, vice president at JPMorgan in New York, or at a minimum consciously avoided such knowledge as it had clearly before it the definitive aspects of the money laundering and embezzlement scheme. The money customers deposited into the bank accounts were not used to purchase any securities or invest in the Forex market as a commodities broker, but rather

accounts were not used to purchase any securities or invest in the Forex market as a commodities broker, but rather transferred monies to other clients through clients' sub accounts and laundered monies in such patterns that could serve no known legitimate business purpose. JPMorgan could have easily detected that Baez and Sanchez through the FIT Entities were never cleared nor registered as a Registered Futures Commodities Merchant ("RFCM") with the National Futures Association ("NFA"). One simple Google search performed by JPMorgan would have provided JPMorgan with the NFA website which clearly indicated, the registration status of the FIT Entities. The history of the registration status is as follows:

## FIT INTERNATIONAL GROUP CORP                NFA ID: 0337065

| History/Status | Effective Date |
| --- | --- |
| NFA MEMBER PENDING STAUS WITHDRAWN | 02/24/2009 |
| INTRODUCING BROKER PENDING STAUS WITHDRAWN | 06/20/2005 |
| FUTURES COMMISSION MERCHANT PENDING | 05/25/2005 |
| NFA MEMBER PENDING | 01/19/2005 |
| INTRODUCING BROKER PENDING | 01/19/2005 |
| NFA MEMBER PENDING STATUS WITHDRAWN | 08/05/2004 |
| INTRODUCING BROKER PENDING STATUS WITHDRAWN | 08/05/2004 |
| NFA MEMBER PENDING | 05/07/2004 |
| INTRODUCING BROKER PENDING | 05/07/2004 |

## FOREX INTERNATIONAL TEAM INC                NFA ID: 0358406

| History/Status | Effective Date |
| --- | --- |
| FUTURES COMMISSION MERCHANT PENDING | 07/18/2006 |
| NFA MEMBER PENDING | 07/18/2006 |
| NFA MEMBER STATUS WITHDRAWN | 04/10/2006 |
| FUTURES COMMISSION MERCHANT PENDING STATUS WITHDRAWN | 04/10/2006 |
| NFA MEMBER PENDING | 11/29/2005 |
| FUTURES COMMISSION MERCHANT PENDING | 11/29/2005 |
| FUTURES COMMISSION MERCHANT PENDING STATUS WITHDRAWN | 11/22/2005 |
| FUTURES COMMISSION MERCHANT PENDING | 08/24/2005 |

3.      On information and belief, JPMorgan aided in the collection of monies by an unregistered commodities merchant. This act is clear violation of the Commodities Exchange Act, 6b:

> It shall be unlawful for any person, including but not limited to any clearing agency of a contract market or derivatives transaction execution facility and any <u>depository,</u> that has received any money, securities, or property for deposit in a separate account as provided in paragraph (2) of this section, 4d–1 to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant.

4.      The first FIT account was opened at JPMorgan in 2003.  Rather than close the account upon learning that a scheme to defraud was afoot or by detecting clear oversight by one of its employees through internal controls, JPMorgan chose to continue to participate in the thievery scheme.  Not just through the various ways JPMorgan participated and aided in their activity, but by assisting to cover the apparent theft with the imprimatur of a globally recognized financial banking institution.

5.      JPMorgan should not have ignored the clear evidence of the laundering scheme but did, and was willfully blind due its gross Anti-Money Laundering detection failure. JPMorgan was Baez and Sanchez primary banker since the opening of the first account on May 30, 2003. JPMorgan provided special amenities to Baez and Sanchez, private small business clients and established a "special relationship" with Baez and Sanchez through the FIT Entities. JPMorgan was responsible for knowing the particulars of their business and in this case, assisted an international client who on a daily basis transferred millions of dollars overseas to Columbia, Panama, Cayman Islands and Switzerland, which are known money laundering havens. It is JPMorgan's own policy to know their small business clients through their own internal policies. From 2003 on, all of the monies that Baez and Sanchez, through the FIT Entities

which it could have reached only one plausible conclusion; Baez and Sanchez, through the FIT Entities were laundering monies internationally. Baez and Sanchez through the FIT Entities cultivated a strong business relationship with JPMorgan as a private small business client with the aid of Yolanda Santiago-Hasbu. From at least 2003, Baez and Sanchez had all the money received in their purported Forex exchange business deposited into the 65 Account at JPMorgan with the following instructions:

> *FIT INTERNATIONAL GROUP, BANK WIRE, TRANSFER INSTRUCTIONS, U.S. FUNDS ONLY, CREDIT, THE JP MORGAN CHASE BANK, 825 UNITED NATIONS PLAZA, NEW YORK NY 10017, ABA 021000021, PHONE (212) 5570435 FOR ACCOUNT OF FIT INTERNATIONAL GROUP CORP. ACC No. 292501956565 "FOR FURTHER CREDIT TO BENEFICIARY".*

6.     By 2005, the FIT Entities had millions of dollars in cash on deposit at JPMorgan. Most transfers were international transfers to Colombia, Panama, Cayman Islands, Switzerland, Spain and Mexico amongst others. On information and belief, deposits were made in a business checking account, therefore JPMorgan had full use of the funds until Baez and Sanchez through the FIT Entities, laundered them.

7.     Each victim that opened a trading account received the 65 Account number. Plaintiffs were given sub-accounts defined as an "Escrow and Client Funds Management Account" which was intended by Plaintiffs to segregate their funds from those in the 65 Account, and as well as from other accounts held by the FIT Entities at JPMorgan. The FIT Entities only accepted cash investments in the 65 Account, which were at times directed to Account xxxx01956-5-66 (the "66 Account") at JPMorgan. The 66 Account belonged to FIT, although deposits were almost invariably sent to the benefit of shell companies, to the family of the

fraudsters, to Plaintiffs' sub account xxxx6103673-65 and to other clients' sub-accounts. Wire transfers were sent directly to the 65 Account at JPMorgan with an advice that the funds were to be credited to the 66 Account for the benefit of a particular victim. On information and belief, checks were also deposited in the 65 Account with the appropriate customer account number indicated on the face of the check. Thus, either way the fact that the monies were not JPMorgan's or belonged to the FIT Entities, but rather to the victim and were being received as a fiduciary was plain on the face of the deposits.

8.     Victims were mostly individuals. JPMorgan permitted all funds from putative investors to be commingled into a single account first and then permitted Baez and Sanchez, through the FIT Entities to withdraw and/or transfer funds without any limitations. As stated, the Plaintiffs were holders of sub-accounts. This scheme to open sub-accounts for the Plaintiffs allowed them to ideally protect their funds under an escrow sub-account status. This scheme was misleading as JPMorgan permitted Baez and Sanchez through the FIT Entities to withdraw funds without restriction. The sub accounts are as follows:

A.     Client: CDS Creditos de Seguros, escrow sub-accounts #xxx610352667/ #xxx610353467;

B.     Client: Daniel Zamora, escrow sub-account #xxx610353466; and

C.     Client: CGC Inc. escrow sub-account #xxx610367365.

9.     These accounts were sub-accounts of the 65 and the 66 Account, which were opened at the behest and concern of the Plaintiffs. The fact is, Plaintiffs' funds were never protected by JPMorgan under this escrow scheme, as would be expected by the type of subaccount status and the manner which one would expect JPMorgan to follow by being an Escrow and Client Funds Management Account.

10.     Upon information and belief, between 2003 and the middle of 2008 the 65 Account and the 66 Account had an average daily balance of several million dollars. In 2008 however, the cash balance in the 65 and 66 the Account began to diminish. Though hundreds of millions of dollars flowed through the 65 and 66 Account, none of it was used to buy, sell or invest in the Forex market on behalf of the FIT Entities as it should have been had FIT been a legitimate RFCM. Instead, emblematic of a money laundering and embezzling scheme, the money in the 65 and 66 Account flowed back and forth between the FIT Entities, their customers, and Plaintiffs' Escrow and Client Funds Management Accounts. Baez and Sanchez, through the FIT Entities stole hundreds of millions of dollars to purchase real property outside of the United States in an attempt to conceal ownership through their shell companies in Colombia and elsewhere.  JPMorgan knew, should have known or was willfully blind to the fact that Baez and Sanchez through the FIT Entities were engaging in thievery based on the obvious fact that voluminous account activity reflected no legitimate business purpose of that of an unregistered commodities broker or any other known business purpose for that matter.

11.     JPMorgan assisted Baez and Sanchez, through the FIT Entities to funnel millions of dollars through various accounts by ignoring clearly illicit transaction activity within those accounts, including millions of dollars in suspicious transactions by and between JPMorgan, Bancolombia (one of the most reputed Colombian Banks), UBS (Switzerland), HSBC (Switzerland) and other financial institutions in such a conscious disregard of its own anti-money laundering policies rather than put a stop to the crime that it must of known or at a minimum consciously avoided was afoot.

12.     JPMorgan continued to participate in the crime as JPMorgan's drive for fees and profits became a substitute for common sense, ethics, legal and moral obligations. JPMorgan had

12.     JPMorgan continued to participate in the crime as JPMorgan's drive for fees and profits became a substitute for common sense, ethics, legal and moral obligations. JPMorgan had previously violated the Bank Secrecy Act ("BSA") by failing to file a Suspicious Activity Report ("SAR") on Madoff Securities in October 2008. Here, JPMorgan failed to maintain an effective anti-money laundering program in 2008, as required under the BSA. On information and belief, JPMorgan failed to enact adequate policies, procedures, and controls to ensure that information about the bank's clients obtained by a simple due diligence search when the accounts were opened were shared with compliance and/or AML personnel.

13.     Federal legislation and regulations have long required banks to have an AML program. One element of these programs is monitoring customer account activity in order to detect possible fraud, money laundering or other improper activity. These requirements were established by the BSA and federal regulations. 31 U.S.C. § 5311; 12 C.F.R.§ 208.63. All federal banking agencies have substantially identical requirements. Those parts of JPMorgan under the supervision of the OCC would have the same obligations. The Patriot Act reinforced such obligations for the robust detection systems to ensure that money lauders and terrorists would not be able to use the United States financial systems to further their crimes.

14.     One purpose of these requirements is to ensure that banks, which are often in the best position to identify potentially illegal activity, will closely observe the transactions taking place within their clients' accounts. The legislation and regulations also provided guidance to banks and financial institutions regarding how best to achieve that goal and what actions to take when suspicious activity is indentified.

15.     Section 352 of the Patriot Act and banking regulations require financial institutions to institute an AML program that includes four pillars: (i) designating an individual

responsible for managing BSA compliance; (ii) a system of policies, procedures, and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel and (iv) independent testing of compliance. 12 C.F.R. § 208.63

16.     Financial institutions must also fully understand the business in which their customers are engaged in. This duty, referred to as the responsibility to "know your customer" is critical to determining what activity was/is suspicious. 12 C.F.R. § 208.62 Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that may suggest an illegal enterprise. The KYC duty also pre dates the Patriot Act. Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manuel of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it is custom within the United States banking industry.

17.     Though JPMorgan may have had AML and KYC programs that facially met requirements of the Patriot Act and industry standards. On information and belief, JPMorgan did not execute these programs and did not submit to the appropriate banking regulators, as it was mandated to do by statute and regulations to report highly suspicious banking activities.

18.     JPMorgan lent legitimacy and cover the laundering operations by evoking protection of sub-accounts to the 65 and the 66 Account, that were Escrow and Client Funds Management Accounts which gave Plaintiffs and expectation of assuredness and by the mere stature of such a well-known international bank where proper due diligence of knowing your customer would be expected protocol.

19.     JPMorgan's failure to do anything to stop the crime in progress was no accident. JPMorgan collected fees and profits in connection with the FIT Entities. JPMorgan had knowledge or at a minimum consciously avoided such knowledge that Baez and Sanchez,

through the FIT Entities were engaging in banking activities with no legitimate business purpose, but rather chose to blind itself willfully to these facts. This willful blindness is the only possible explanation for such failure to detect the money-laundering scheme through their AML system.

20.     What appeared to be legitimate opportunities in the Forex market turned out to be an extensive fraudulent enterprise through which Baez and Sanchez, through the FIT Entities, aided by JPMorgan stole or diverted millions of dollars through a pattern of racketeering involving criminal acts of wire fraud, money laundering, embezzlement. This scheme was made possible through the active involvement of JPMorgan and its employee, Yolanda Santiago-Hasbu. JPMorgan played a crucial and pivotal role by violating of the Commodities Exchange Act from the inception of the accounts being opened which on information and belief, was aided by its employees and by the surrounding circumstances.

21.     Sanchez and Baez, through the FIT Entities and with the participation of others known and unknown, promoted, managed and supervised this theft scheme to fraudulently induce investors to supposedly invest in the Forex market. Acting in concert, Sanchez, Baez, through the FIT Entities and JPMorgan, through the assistance of its employees operated the scheme to the detrimental reliance of the Plaintiffs as well as other victims. Upon information and belief, senior bank officers played an active role in the scheme and facilitated its continued existence. Since 2009, Baez and Sanchez were wanted for questioning concerning money laundering by the F.B.I. The Colombian General Attorney (Fiscalia General de Colombia) has recently indicted Baez and Sanchez for unusual solicitation and money laundering. Baez and Sanchez are currently under house arrest.

## II.    JURISDICTION AND VENUE

22.    This Court has jurisdiction over the subject matter of the causes of action in this

Complaint by virtue of:

(A) federal question jurisdiction pursuant to 28 U.S.C. Section 1331, involving an action pursuant to 18 U.S.C. Sections 1964(a) and (c), the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"); This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §1332;

(B) diversity jurisdiction pursuant to 28 U.S.C. Section 1332(a)(1), involving an action between citizens of diverse states with an amount in controversy in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs;

(C)   supplemental jurisdiction pursuant to 28 U.S.C. Section 1367(a), involving claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution; and

23.    This Court has jurisdiction over the persons of the defendants because:

(A)   each defendant either resides or transacts business within this judicial district; and

(B)   each defendant is amenable to service of process within the meaning of Federal Rule

of Civil Procedure 4(e), 4(f) and 18 U.S.C. Section 1965(b).

24.    Venue is proper in this district pursuant to 18 U.S.C. Section 1965 and 28 U.S.C. Section 1391 because Defendants either reside or transact business in this district or, alternatively, this district is where a substantial part of the events or omissions giving rise to the claim occurred.

## III.   PARTIES

25.    Plaintiff Zamora is domiciled in Bogotá D.C. Colombia. Zamora is a client of FIT and JPMorgan, and incurred losses and/or damages as a result of the activities alleged herein. Plaintiff and/or his property and/or estate were injured as a result of the conduct alleged herein. JPMorgan received plaintiff's property as cash received, acquired or held by or for the account of FIT and/or in segregated escrow accounts from or for the accounts of the plaintiff and the proceeds of any such property transferred by FIT, including property unlawfully converted

26.      Plaintiff CGC is a corporation domiciled in the Republic of Panama and legally represented by Daniel Zamora. CGC is a customer of FIT and JPMorgan and incurred losses and/or damages as a result of the activities alleged herein. Plaintiffs and/or their property and/or estate were injured as a result of the conduct alleged herein. JPMorgan received Plaintiff's property as cash received, acquired or held by or for the account of FIT from or for the accounts of Plaintiffs, and the proceeds of any such property transferred by FIT, including property unlawfully converted customer property. Plaintiff has suffered an injury-in-fact for which they are entitled to seek monetary damages or equitable relief.

27.      Defendant JPMorgan Chase & Co. is a financial holding company incorporated under Delaware law with its principal place of business at 270 Park Avenue, New York, New York 10017. JPMorgan Chase is one of the largest banking institutions in the United States, with approximately $2.0 trillion in assets and $165.4 billion in stockholders' equity as of December 31, 2009.

28.      JPMorgan Chase & Co. created and implemented anti-money laundering policies that governed how they monitored the activity in the 66, 65, xxx610352667, xxx610353467, xxx610353466 and xxx610367365 accounts.

29.      Defendant JPMorgan Chase Bank, N.A. is one of the main bank subsidiaries and is organized under the laws of the United States with its principal place of business at 111 Polaris Parkway, Columbus, Ohio 43240. Chase Bank is a national banking association in the United States with locations in 23 states, including a location in New York, New York. Before November 2004, JPMorgan Chase Bank was a New York state chartered bank, regulated by the New York State Banking Department. On July 9, 2004, JPMorgan Chase Bank requested approval to convert to a national banking association. This request was approved by the Office of

New York State Banking Department. On July 9, 2004, JPMorgan Chase Bank requested approval to convert to a national banking association. This request was approved by the Office of the Comptroller of the Currency ("OCC") on October 13, 2004. At that time, the bank's name was changed to JPMorgan Chase Bank, N.A.

30.     Dilia Margarita Baez is an individual whose last known address is Calle 100, #8A-37, Torre A #501, Bogota, Colombia.

31.     Jairo Enrique Sanchez is an individual whose last known address is Calle 100, #8A-37, Torre A #501, Bogota, Colombia.

32.     FIT International Group Corp. is a corporation organized under the laws of the State of Florida, with its principal place of business at 7300 N.W. 19th Street, Suite 101, Miami, FL 33126-1222. FIT International Group Corp. was incorporated, on May 12, 2003, by Baez. FIT International Group Corp. has only two directors on its board, Sanchez and Baez. Baez is also the President. Sanchez is the Treasurer and Secretary of the company. There are no other officers. FIT International Group Corp., has only two stockholders, Baez and Sanchez.

33.     Upon information and belief, Forex International Team Inc. is a New York corporation, with its principal place of business at 14 Wall Street, 20th Floor, New York, N.Y. 10005. Baez is the President and sole officer, and Sanchez is the sole director.

34.     This Court has personal jurisdiction over all of the defendants captioned herein. All defendants have maintained minimum contacts with New York in connection with the claims alleged herein. The defendants have: (a) intentionally taken full advantage of the rights, benefits and privileges of conducting business and/or transactions in the State of New York; (b) purposefully availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and by receiving customer property to their benefit; (c)

derived significant revenue from New York; (d) maintained minimum contacts and/or general business contacts with New York in connection with the claims alleged herein; and (e) committed tortious acts both within and without New York, causing injury in New York, and (i) regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in New York, or (ii) expect or should reasonably expect the acts to have consequences in New York and derive substantial revenue from interstate and international commerce.

## IV.    GENERAL ALLEGATIONS

35.    Sanchez and Baez marketed themselves as foreign currency trading experts. Forex is the name for the trading market in foreign currency. Forex trading is not conducted on a central exchange, but through an interbank market, an over the counter exchange, where parties trade directly with each other over the telephone or through electronic networks. The Forex trading market trades approximately three trillion dollars a day. Sanchez and Baez held themselves out as experienced experts in this market.

36.    Sanchez and Baez marketed their expertise directly and through various corporate entities, including Forex Investment Team A.G., a company incorporated in Switzerland in 2008, and was registered as an investment advisor in Colombia. Sanchez and Baez also used Forex Investment Team S.A., a Colombian company, which was not authorized to solicit clients for investment purposes. Sanchez and Baez claimed to execute a proprietary Forex trading strategy through FIT Investment Group, a purported corporation, and at other times a purported limited liability company, organized under the laws of the State of New York. No such company has ever been incorporated. Only defendant Forex International Team Inc. was incorporated in New York, FIT International Group, incorporated in Miami and like FIT Switzerland and FIT

37.     The opening and maintaining of an account on behalf of an entity that was not incorporated in New York was a major due diligence failure on behalf of JPMorgan, as JPMorgan was the gatekeeper to the super highway of commerce and negligently gave Baez and Sanchez access. JPMorgan did not comply with the "know your customer" standard. If proper due diligence were performed on any of the FIT Entities, Baez or Sanchez, no accounts would have been opened for the fraud to flourish unless JPMorgan through Yolanda Santiago-Hasbu aided and abetted their crimes. Baez and Sanchez with the aid of Yolanda Santiago-Hasbu, (vice president of JPMorgan in New York, opened another account with JPMorgan under another entity entitled Fit International Team. Once again, Baez and Sanchez, through the FIT Entities attempted to gain registration status as a commodities merchant with the use of this entity. JPMorgan should have recognized that such a variation of known name, similar to the earlier unincorporated entity, was a red flag, unless Hasbu buried it. On May 3, 2003, Yolanda Santiago-Hasbu opened the 65 Account without a SS/TIN#. If proper AML diligence were preformed at the time of account opening, JPMorgan would have identified that the accounts had no true investment purpose.

38.     FIT International Group, a purported New York corporation or limited liability company was a fraud.  Sanchez and Baez solicited clients mainly by marketing to them through social connections. As Sanchez and Baez began to solicit more investors, in order to raise the sophistication level of their scheme, and to provide an added measure of perceived legitimacy, on May 12, 2003, Baez incorporated yet another company, FIT International Group Corp in the State of Florida.  Sanchez and Baez were the sole shareholders, the sole directors, and the sole officers of the company. Sanchez and Baez used the FIT Entities to open bank the accounts with JP Morgan in New York, assuring investors that their money would be deposited into segregated

accounts at a reputable United States bank. Sanchez and Baez fraudulently promised that FIT International Group "has all of the applicable required government approvals, licenses, and permits, including but not limited to, if applicable, registration with the NFA as a commodity trader advisor".

39.    FIT International Group did not exist, and it was a device through which Sanchez and Baez defrauded clients. None of the FIT Entities were registered with the NFA or the Commodity Futures Trade Commission. While applications had been pending with the NFA, those applications were never approved. On information and belief, Plaintiffs' accounts were segregated. Upon information and belief, Sanchez and Baez did not engage in Forex trading as represented, but devised a scheme merely to steal the funds that clients had invested with them. As Plaintiffs invested in the scam, no monies were ever invested in a Forex trading platform as they had promised, but merely siphoned it away to accounts at HSBC, UBS, and others. Baez and Sanchez then used the funds for their own purposes, upon information and belief to support terrorism within Colombia. In order to deceive clients that they were trading on their behalf, with consistent, profitable returns, they issued false and misleading electronic monthly statements that purportedly showed profitable foreign currency trades, and increasing investment returns over a consistent period. Contrary to their representations and statements, upon information and belief, Baez and Sanchez through the FIT Entities never invested the amounts they had claimed and merely produced false trades to cover their misconduct and report false profits to investors. These false monthly statements showed consistent, stable returns to investors for years, in spite of significant market volatility.  Baez and Sanchez used these false returns to solicit new clients and additional funds, claiming that their investment strategy was reliable and profitable. Over time as is common in the embezzlement world, withdrawals and redemptions increased, coupled

with decreasing new investors, the money laundering and embezzlement scheme began to falter. Facing practically complete redemption requests for the remaining funds, Baez and Sanchez through the FIT Entities falsely claimed that they were processing all requests and would issue returns shortly. By February 2009, the returns never came. Investors demanded information to verify the purported transactions that produced the catastrophic losses, including the counterparties and interbank records.

40.     Baez and Sanchez could not produce any evidence of the purported trades. Rather than investing client funds in the particular Forex trading platform as promised, upon information and belief, Baez and Sanchez merely parked Plaintiffs funds at JPMorgan and used the money to fund fraudulent operations and to promote their money laundering and embezzlement scheme. Upon information and belief, Baez and Sanchez also paid themselves, friends, family members and misappropriated substantial amounts of funds to other business ventures, including Swiss, Panamanian and Colombian shell companies controlled by Sanchez and Baez to purchase real property outside of the U.S. and to evade its laws. Baez and Sanchez have failed to answer process issued by the CFTC.

41.     JPMorgan account was reported closed as of May 29, 2009.  Baez and Sanchez did provide limited bank account statements to clients. Most of clients' funds were not segregated as promised, except for the Plaintiffs and several other victims.  A critical part of this fraudulent scheme required Baez and Sanchez to conceal the misappropriations and to maintain the pretense that the FIT Entities were trading in the Forex market. To accomplish this Baez and Sanchez, through the FIT entities needed JPMorgan help to do at least two things:

1.   To make payments to investors under the pretense that these payments came from Forex investments; and

2.   To take steps to maintain the appearance of legitimacy of the overall operation,

1. To make payments to investors under the pretense that these payments came from Forex investments; and

2. To take steps to maintain the appearance of legitimacy of the overall operation, providing documents, account balances, and other documents to conceal the truth from the investors with the aid of employees to keep the investors and encourage them to re-invest, and to attract additional investors.

42.     Plaintiffs relied heavily upon JPMorgan's involvement and considered JPMorgan's participation to be a substantial basis for the Plaintiffs' confidence in the legitimacy of the transactions and the safety of their funds by the type of accounts the Plaintiffs held at JPMorgan.

43.     JPMorgan also performed and profited from the day-to-day transactions that were necessary both to execute and to conceal the scheme. JPMorgan received and sent wire transfers of large sums of money to and from investors bank accounts throughout the United States to Colombia. In particular, JPMorgan received and sent wire transfers of money to and from Plaintiffs' bank accounts in Panamá and the Cayman Islands. JPMorgan also transferred money among several JPMorgan accounts at the direction of Sanchez and Baez, assisting in the scheme by concealing the fraudulent operations of the enterprise to personally benefit Baez, Sanchez and others.   Among the numerous fraudulent representations Baez and Sanchez made to Plaintiff were the following:

(A)     Baez and Sanchez told their victims that funds was always on demand and ready to be off set and returned at any time, at client's request;

(B)     Baez and Sanchez told the victim-investors that the purported defendant was a person or business that would be highly embarrassed by the lawsuit, and confidentiality;

(C)    Baez and Sanchez told their victims that FIT Entities would obtain profitability well above the market;

(D)    According to their publicity, the FIT Entities would invest and manage investors-victim monies in a very conservative way;

(E)    Baez and Sanchez told the victims all monies would be kept in a triple A American Bank (JPMorgan) and in an escrow account in order to safeguard all funds;

(F)    Baez and Sanchez told investors-victims they would have a monthly statement, which resulted to be faked; and

(G)    Baez and Sanchez told victims that their investments were totally safe.

44.    Upon information and belief, as part of the scheme, JPMorgan opened a separate accounts for the Plaintiffs and JPMorgan falsely represented to victims that the funds from the 66 Account had already been deposited into that account and those funds could not be distributed to anyone other than to trade in the Forex market. JPMorgan provided apparent security over Plaintiffs funds. On information and belief, JPMorgan officials repeatedly provided bank records, including account balances, verifications, and other documents confirming that the funds in the Plaintiffs' escrow accounts were secure in those accounts.

45.    Over the course of the conspiracy, hundreds of millions of dollars from victims of the scheme were held by JPMorgan through and co-conspirators used the funds obtained from victim-investors in various ways to conceal the true nature of the fraud and to provide an air of legitimacy to attract additional investments by Plaintiffs and others. Baez and Sanchez illegally obtained millions of dollars from Plaintiffs and others. Baez and Sanchez repeatedly made false and fraudulent misrepresentations to Plaintiffs, upon which Plaintiffs relied to their detriment.

Each transaction that resulted in Plaintiffs transferring funds to Baez and Sanchez, through the FIT Entities was followed by another such criminal transaction.

## COUNT ONE

### WIRE FRAUD
(Against all Defendants)

46. In total, CGC wired $6,785,032.26 to the 65 Account at JPMorgan by means of wire transfers between Credit Bank Trust (Cayman Islands) and Bancolombia (Panama) from December 2004 through December 2008. With respect to each transaction, Plaintiffs had sought and received verbal and written assurances from Baez and Sanchez and others at their direction sent primarily by telephone or by email, that the funds were deposited into the 65 Account with the final beneficiary to be the Plaintiffs' sub-accounts.

47. All of the assurances given by Baez and Sanchez were false and fraudulent. Without having received these false and fraudulent representations, Plaintiffs would not have invested in or transferred any funds to JPMorgan.

48. Absent the fraud orchestrated by Baez and Sanchez, through the FIT Entities and assisted by JPMorgan and others, Plaintiffs would not have made any of the wire transfers. By engaging in the foregoing scheme involving Baez, Sanchez and the FIT Entities, JPMorgan intentionally or at a minimum was criminally reckless by participating in a scheme using the wires to defraud Plaintiffs of money by means of material omissions. Plaintiffs reasonably relied on misrepresentations and material omissions made by Baez and Sanchez, through the FIT Entities and others in furtherance of the fraudulent scheme. Plaintiffs suffered injury as a result of the fraud in the amounts of money all defendants obtained from the Plaintiffs.

49. Through the foregoing conduct, Bacz and Sanchez, through the FIT Entities and JPMorgan having devised, and intending to devise a scheme and artifice to defraud, for obtaining

money and property by means of false and fraudulent pretenses, representations, promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs and signals for the purpose of executing such scheme and artifice to defraud, in violation of 18 US.C. Section 1343.

## COUNT TWO

### INTERSTATE TRANSPORTATION OF STOLEN PROPERTY
(Against all Defendants)

50.     The allegations of paragraphs 1 through 49 are incorporated herein by reference. In addition, the foregoing scheme and each act committed in furtherance thereof set forth in paragraphs 1 through 49 constitute violations of the National Stolen Property Act, 18 U.S.C. Section 2314, in that all defendants transported, transmitted, and transferred in interstate and foreign commerce goods and money of the value of $5,000 or more, knowing the same to have been stolen, converted and taken by fraud, in violation of 18 U.S.C. Section 2314.

## COUNT THREE

### MONEY LAUNDERING
(Against all Defendants)

51.     The allegations of paragraphs 1 through 50 are incorporated herein by reference. Baez, Sanchez, the FIT Entities and JPMorgan's criminally reckless assent to the operation of the fraudulent scheme, they engaged in, and otherwise caused, numerous financial transactions and transfers through financial institutions in the United States, which transactions violated 18 U.S.C. Sections 1956 and 1957 (money laundering). Baez and Sanchez, through the FIT Entities JPMorgan and its employees committed acts of money laundering, namely financial transactions to promote their unlawful misappropriation of Plaintiffs' funds in violation of 18 U.S.C. Section 1956(a)(1)(A), and to conceal their unlawful activity in violation of 18 U.S.C. Section

1956(a)(1)(B). The dates and amounts of the financial transactions engaged in and caused by defendants in furtherance of the specified unlawful activity, as set forth in detail herein, that is, wire fraud and/or interstate transportation of stolen property. Those are the monies transferred by FIT using the 65 account. The chart below illustrates the monies transferred by the FIT Entities using the 65 Account to Jairo Sánchez, a FIT director and such transfers were not contemplated by the investor agreements or Plaintiffs and constitute embezzlement and other crimes alleged herein.

| Date | Amount | Final Beneficiary |
|------|--------|-------------------|
| 8/3/2003 | $10,000.00 | Jairo Sanchez |
| 2/4/2005 | $12,000.00 | Jairo Sanchez |
| 4/26/2005 | $15,000.00 | Jairo Sanchez |
| 10/13/2005 | $11,000.00 | Jairo Sanchez |
| 12/14/2005 | $16,000.00 | Jairo Sanchez |
| 3/3/2006 | $120,000.00 | Jairo Sanchez |
| 12/12/2006 | $31,000.00 | Jairo Sanchez |
| 12/21/2006 | $20,000.00 | Jairo Sanchez |
| 5/24/2007 | $20,000.00 | Jairo Sanchez |
| 9/07/2007 | $15,000.00 | Jairo Sanchez |
| 7/12/2007 | $30,000.00 | Jairo Sanchez |
| 9/14/2007 | $20,000.00 | Jairo Sanchez |
| 1/24/2008 | $100,000.00 | Jairo Sanchez |
| 8/22/2008 | $100,000.00 | Jairo Sanchez |
| 9/2/2008 | $50,000.00 | Jairo Sanchez |
| 9/1/2008 | $2,500.00 | Jairo Sanchez |
| Total: | $592,500.00 | |

52.   Funds transferred by the FIT Entities using the 65 Account to Dilia Margarita Baez, a FIT Director, such transfers were not contemplated by the investor agreement or the Plaintiffs and constitutes embezzlement and other claims made herein.

| Date | Amount | Final Beneficiary |
|------|--------|-------------------|
| 4/28/2004 | $8000.00 | Dilia Margarita Baez |
| 5/19/2004 | $30,000.00 | Dilia Margarita Baez |
| 5/19/2004 | $10,000.00 | Dilia Margarita Baez |
| 8/3/2004 | $10,000.00 | Dilia Margarita Baez |
| 8/11/2004 | 15,000.00 | Dilia Margarita Baez |
| 8/11/2004 | $12,000.00 | Dilia Margarita Baez |

| | | |
|---|---|---|
| 9/8/2004 | $10,000.00 | Dilia Margarita Baez |
| 11/10/2004 | $25,000.00 | Dilia Margarita Baez |
| 11/22/2004 | $16,000.00 | Dilia Margarita Baez |
| 12/6/2004 | $40,000.00 | Dilia Margarita Baez |
| 12/21/2009 | $100,000.00 | Dilia Margarita Baez |
| 3/3/2005 | $10,000.00 | Dilia Margarita Baez |
| 3/9/2005 | $31,700.00 | Dilia Margarita Baez |
| 3/9/2005 | $27,000.00 | Dilia Margarita Baez |
| 4/8/2005 | $40,000.00 | Dilia Margarita Baez |
| 4/22/2005 | $20,000.00 | Dilia Margarita Baez |
| 7/21/2005 | $200,000.00 | Dilia Margarita Baez |
| 7/21/2005 | $200,000.00 | Dilia Margarita Baez |
| 8/3/2005 | $100,000.00 | Dilia Margarita Baez |
| 9/7/2005 | $10,000.00 | Dilia Margarita Baez |
| 9/15/2005 | $85,000.00 | Dilia Margarita Baez |
| 11/1/2005 | $50,000.00 | Dilia Margarita Baez |
| 11/1/2005 | $110,000.00 | Dilia Margarita Baez |
| 11/14/2005 | $10,000.00 | Dilia Margarita Baez |
| 11/29/2005 | $45,000.00 | Dilia Margarita Baez |
| 12/13/2005 | $85,000.00 | Dilia Margarita Baez |
| 12/15/2005 | $50,000.00 | Dilia Margarita Baez |
| 2/10/2006 | $20,000.00 | Dilia Margarita Baez |
| 3/7/2006 | $10,000.00 | Dilia Margarita Baez |
| 3/14/2006 | $60,000.00 | Dilia Margarita Baez |
| 4/27/2006 | $10,000.00 | Dilia Margarita Baez |
| 5/15/2006 | $40,000.00 | Dilia Margarita Baez |
| 10/5/2006 | $500,000.00 | Dilia Margarita Baez |
| 10/10/2006 | $100,000.00 | Dilia Margarita Baez |
| 10/12/2006 | $125,000.00 | Dilia Margarita Baez |
| 10/27/2006 | $7,950.00 | Dilia Margarita Baez |
| 11/10/2006 | $500,000.00 | Dilia Margarita Baez |
| 11/29/2006 | $100,000.00 | Dilia Margarita Baez |
| 12/12/2006 | $7960.00 | Dilia Margarita Baez |
| 12/21/2006 | $30,000.00 | Dilia Margarita Baez |
| 5/8/2007 | $100,000.00 | Dilia Margarita Baez |
| 5/10/2007 | $100,000.00 | Dilia Margarita Baez |
| 7/5/2007 | $200,000.00 | Dilia Margarita Baez |
| 7/12/2007 | $50,000.00 | Dilia Margarita Baez |
| 9/21/2007 | $1,000,000.00 | Dilia Margarita Baez |
| 10/17/2006 | $250,000.00 | Dilia Margarita Baez |

| | | |
|---|---|---|
| 11/30/2007 | $3,000,000 | Dilia Margarita Baez |
| 3/10/2009 | $7,950.00 | Dilia Margarita Baez |
| 8/4/2008 | $7,950.00 | Dilia Margarita Baez |
| 5/9/2008 | $7,950.00 | Dilia Margarita Baez |
| 5/22/2008 | $100,000.00 | Dilia Margarita Baez |
| 6/18/2008 | $400,000.00 | Dilia Margarita Baez |
| 7/8/2008 | $7,950.00 | Dilia Margarita Baez |
| 6/25/2008 | $12,500.00 | Dilia Margarita Baez |
| 9/2/2008 | $100,000.00 | Dilia Margarita Baez |
| 9/2/2008 | $50,000.00 | Dilia Margarita Baez |
| 10/3/2008 | $7,950.00 | Dilia Margarita Baez |
| Total: | $7,960,810.00 | |

53.     Funds transferred by the FIT Entities using the 65 Account to FIT International

Team, a shell company domiciled in Colombia, which supports allegations made herein.

| Date | Amount | Final Beneficiary |
|---|---|---|
| 4/28/2002 | $7,000.00 | Forex International Team |
| 7/28/2004 | $10,000.00 | Forex International Team |
| 8/23/2004 | $10,000.00 | Forex International Team |
| 9/13/2004 | $20,000.00 | Forex International Team |
| 10/13/2004 | $10,000.00 | Forex International Team |
| 11/22/2004 | $26,000.00 | Forex International Team |
| 1/19/2005 | $20,000.00 | Forex International Team |
| 2/24/2005 | $20,000.00 | Forex International Team |
| 3/14/2205 | $20,000.00 | Forex International Team |
| 4/14/2005 | $20,000.00 | Forex International Team |
| 5/18/2005 | $20,000.00 | Forex International Team |
| 6/16/2005 | $20,000.00 | Forex International Team |
| 7/1/2005 | $20,000.00 | Forex International Team |
| 8/19/2005 | $20,000.00 | Forex International Team |
| 9/15/2005 | $20,000.00 | Forex International Team |
| 10/19/2005 | $20,000.00 | Forex International Team |
| 11/15/2005 | $25,000.00 | Forex International Team |
| 11/29/2005 | $39,000.00 | Forex International Team |
| 1/26/2006 | $10,000.00 | Forex International Team |
| 10/2/2006 | $20,000.00 | Forex International Team |
| 3/3/2006 | $25,000.00 | Forex International Team |
| 3/15/2006 | $15,000.00 | Forex International Team |
| 5/16/2006 | $35,000.00 | Forex International Team |
| 6/22/2006 | $30,000.00 | Forex International Team |
| 9/27/2007 | $350,000.00 | Forex International Team |
| Total | $689,000.00 | |

54.     Funds transferred by the FIT Entities using the 65 Account to Semnar
International S.A., a shell company domiciled in Colombia, which constitutes embezzlement,
other crimes and supports allegations made in herein.

| Date | Amount | Final Beneficiary |
|---|---|---|
| 11/23/2004 | $210,000.00 | Semar International S.A. |
| 12/6/2004 | $80,000.00 | Semar International S.A. |
| 4/28/2005 | $40,000.00 | Semar International S.A. |
| 6/2/2005 | $50,000.00 | Semar International S.A. |
| 7/1/2005 | $50,000.00 | Semar International S.A. |
| 8/22/2005 | $50,000.00 | Semar International S.A. |
| 8/12/2005 | $60,000.00 | Semar International S.A. |
| 10/19/2005 | $50,000.00 | Semar International S.A. |
| 11/15/2005 | $50,000.00 | Semar International S.A. |
| 11/29/2005 | $50,000.00 | Semar International S.A. |
| 2/1/2006 | $50,000.00 | Semar International S.A. |
| 2/10/2006 | $40,000.00 | Semar International S.A. |
| 3/3/2006 | $100,000.00 | Semar International S.A. |
| 5/15/2006 | $50,000.00 | Semar International S.A. |
| 11/1/2006 | $50,000.00 | Semar International S.A. |
| 12/20/2006 | $350,000.00 | Semar International S.A. |
| 1/30/2007 | $100,000.00 | Semar International S.A. |
| 6/30/2007 | $50,000.00 | Semar International S.A. |
| 1/25/2008 | $40,000.00 | Semar International S.A. |
| 2/19/2008 | $50,000.00 | Semar International S.A. |
| 2/29/2008 | $50,000.00 | Semar International S.A. |
| | $1,820,000.00 | |

55.     Funds transferred by the FIT Entities using the 65 Account to Bull & Bear
Investment Corporation S.A., a shell company domiciled in Panamá created by Baez and
Sanchez. Such transfers support allegations made in herein.

| Date | Amount | Final Beneficiary |
|---|---|---|
| 4/11/2006 | $100,000.00 | Bull & Bear Investment Corporation |
| 5/3/2006 | $100,000.00 | Bull & Bear Investment Corporation |
| 6/14/2006 | $50,000.00 | Bull & Bear Investment Corporation |
| 9/18/2006 | $35,000.00 | Bull & Bear Investment Corporation |
| 10/19/2006 | $35,000.00 | Bull & Bear Investment Corporation |
| 11/22/2006 | $35,000.00 | Bull & Bear Investment Corporation |
| 11/28/2006 | $50,000.00 | Bull & Bear Investment Corporation |
| 12/20/2006 | $100,000.00 | Bull & Bear Investment Corporation |
| 12/20/2006 | $38,000.00 | Bull & Bear Investment Corporation |

| | | |
|---|---|---|
| 1/30/2007 | $50,000.00 | Bull & Bear Investment Corporation |
| 12/21/2006 | $150,000.00 | Bull & Bear Investment Corporation |
| 1/25/2007 | $52,000.00 | Bull & Bear Investment Corporation |
| 3/5/2007 | $43,200.00 | Bull & Bear Investment Corporation |
| 4/27/2007 | $30,000.00 | Bull & Bear Investment Corporation |
| 6/13/2007 | $77,000.00 | Bull & Bear Investment Corporation |
| 7/13/2007 | $55,000.00 | Bull & Bear Investment Corporation |
| 9/6/2007 | $60,000.00 | Bull & Bear Investment Corporation |
| 1/4/2007 | $90,000.00 | Bull & Bear Investment Corporation |
| 11/13/2006 | $80,000.00 | Bull & Bear Investment Corporation |
| 12/5/2007 | $96,000.00 | Bull & Bear Investment Corporation |
| 1/25/2008 | $100,000.00 | Bull & Bear Investment Corporation |
| 2/19/2008 | $50,000.00 | Bull & Bear Investment Corporation |
| 2/29/2008 | $100,000.00 | Bull & Bear Investment Corporation |
| 7/25/2008 | $40,000.00 | Bull & Bear Investment Corporation |
| 8/22/2008 | $50,000.00 | Bull & Bear Investment Corporation |
| 8/22/2008 | $30,000.00 | Bull & Bear Investment Corporation |
| 8/28/2008 | $50,000.00 | Bull & Bear Investment Corporation |
| 9/22/2008 | $70,000.00 | Bull & Bear Investment Corporation |
| 9/22/2008 | $20,000.00 | Bull & Bear Investment Corporation |
| 10/27/2008 | $20,000.00 | Bull & Bear Investment Corporation |
| 4/12/2008 | $60,000.00 | Bull & Bear Investment Corporation |
| 4/12/2008 | $40,000.00 | Bull & Bear Investment Corporation |
| Total | 21,898,200.00 | |

56.     Funds transferred by the FIT Entities using the 65Account to Jesmar S.A., a shell company domiciled in Panamá and created by Baez and Sanchez, which constitutes embezzlement, certain other crimes and supports allegations made herein.

| Date | Amount | Final Beneficiary |
|---|---|---|
| 4/11/2006 | $100,000.00 | Jesmar Panama S.A. |
| 4/27/2006 | $100,000.00 | Jesmar Panama S.A. |
| 5/15/2006 | $20,000.00 | Jesmar Panama S.A. |
| 9/18/2006 | $35,000.00 | Jesmar Panama S.A. |
| 10/4/2006 | $50,000.00 | Jesmar Panama S.A. |
| 10/27/2006 | $50,000.00 | Jesmar Panama S.A. |
| 11/28/2006 | $50,000.00 | Jesmar Panama S.A. |
| 12/20/2006 | $350,000.00 | Jesmar Panama S.A. |
| 12/21/2006 | $150,000.00 | Jesmar Panama S.A. |
| 1/30/2007 | $50,000.00 | Jesmar Panama S.A. |
| 2/27/2007 | $350,000.00 | Jesmar Panama S.A. |
| 4/27/2007 | $40,000.00 | Jesmar Panama S.A. |
| 5/30/2007 | $100,000.00 | Jesmar Panama S.A. |
| 6/26/2007 | $160,000.00 | Jesmar Panama S.A. |
| 7/5/2007 | $60,000.00 | Jesmar Panama S.A. |

| Date | Amount | | Final Beneficiary |
|------|--------|---|---|
| 7/13/2007 | $150,000.00 | | Jesmar Panama S.A. |
| 8/30/2007 | $50,000.00 | | Jesmar Panama S.A. |
| 10/9/2007 | $50,000.00 | | Jesmar Panama S.A. |
| 10/18/2007 | $100,000.00 | | Jesmar Panama S.A. |
| 11/13/2006 | $50,000.00 | | Jesmar Panama S.A. |
| 1/25/2008 | $40,000.00 | | Jesmar Panama S.A. |
| 2/19/2008 | $50,000.00 | | Jesmar Panama S.A. |
| 2/29/2008 | $50,000.00 | | Jesmar Panama S.A. |
| 3/17/2008 | $50,000.00 | | Jesmar Panama S.A. |
| 7/25/2008 | $40,000.00 | | Jesmar Panama S.A. |
| 8/22/2008 | $50,000.00 | | Jesmar Panama S.A. |
| 9/23/2008 | $20,000.00 | | Jesmar Panama S.A. |
| Total: | 2,365,000.00 | | |

57.     Funds were transferred by the FIT Entities using the 65 Account to Gimnasio Campestre Georges Berkerley, S.A. a shell company domiciled in Colombia and created by FIT, such transaction was not agreed to by the Plaintiffs. These transactions support allegations made herein.

| Date | Amount | Final Beneficiary |
|------|--------|-------------------|
| 3/11/2006 | $20,000.00 | Gimnasio Campestre Berkerley |

## COUNT FOUR

### RICO VIOLATIONS
(Against Baez, Sanchez and The FIT Entities)

58.     The allegations of paragraphs 1 through 57 are incorporated herein by reference.

59.     Upon information and belief, after the funds were received in Plaintiffs' "Escrow and Client Funds Management Account" account at JPMorgan.  Bacz and Sanchez through the FIT Entities, transferred the money to other accounts at JPMorgan and used the funds for various purposes having nothing to do with a purported Forex investment that Plaintiffs believed they had invested in. The foregoing scheme, as set forth in detail hereinabove in paragraphs 1 through 58 and each act committed in furtherance thereof, constitutes money laundering within the meaning of 18 U.S.C. Sections 1956 and 1957 in that:

(A) Baez and Sanchez through the FIT Entities knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely wire fraud (18 U.S.C. § 1343) and interstate transportation of stolen goods (18 U.S.C. § 2314), knowing that the transactions were designed in whole or in part to promote the carrying on of the foregoing specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(i);

(B) Baez and Sanchez through the FIT Entities knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely wire fraud (18 U.S.C. § 1343) and interstate transportation of stolen goods (18 U.S.C. § 2314), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the foregoing specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(B)(i); and

(C) Baez and Sanchez through the FIT Entities in an offense that took place in the United States, knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000,that was derived from specified unlawful activity, namely wire fraud (18 U.S.C. § 1343) and interstate transportation of stolen goods (18 U.S.C. § 2314), in violation of 18 U.S.C. §1957.

### THE ENTERPRISE

60.     At all relevant times, Baez and Sanchez through the FIT Entities, associated in fact with each other and with others known and unknown so as to constitute an "enterprise" within the meaning of 18 U.S.C. Sections 1961(4) and 1962(c). At all times relevant to this Complaint, the enterprise was engaged in, and its activities affected, interstate and foreign commerce. The "association in fact" enterprise had an ascertainable structure and organization and existed apart from its predicate acts. JPMorgan associated with the enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the activities of the enterprise.

61.     Baez and Sanchez, through the FIT Entities with the aid of JPMorgan associated with each other for the common purpose of defrauding the Plaintiffs and converting funds and property for personal gain. In furtherance of the enterprise, Baez and Sanchez, through the FIT Entities, with the aid of JPMorgan and its employees committed numerous overt acts, as set forth

in Paragraphs 1 through 60 of this Complaint, including violations of wire fraud, interstate transportation of stolen property, and money laundering statutes. Baez, Sanchez and JPMorgan knowingly or at a minimum consciously avoided such knowledge of the fraud and conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise within the meaning of 18 U.S.C. Section 1962(c). Furthermore, the defendants were "employed by or associated with" the enterprise within the meaning of 18 U.S.C. Section 1962(c).

62.     Baez and Sanchez, through the FIT Entities directed and managed enterprise activities through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1), 1961(5), and 1962(c).

63.     Baez and Sanchez, through the FIT Entities conducted and participated in enterprise affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1), 1961(5), and 1962(c).

## COUNT FIVE

### FRAUDULENT MISREPRESENTATION
(Baez, Sanchez and the FIT Entities)

64.     The allegations of paragraphs 1 through 63 are incorporated herein by reference.

65.     As described more fully above, Baez and Sanchez, through the FIT Entities were operating a fraudulent scheme with the assistance of JPMorgan, its employees and others known and unknown.  In furtherance of the scheme, and as alleged throughout this Complaint, Baez and Sanchez knowingly made material false statements and representations including but not limited to:

(A)     Supplying Plaintiffs with false and fraudulent bank account statements for their Accounts at JPMorgan;

(B)     Baez and Sanchez, through the FIT Entities, intended for Plaintiff to rely and act upon their knowingly false representations; and

(C)     Plaintiffs justifiably relied on their false statements.

66.     As a direct and proximate result of the false statements, Plaintiffs have sustained damages.

## COUNT SIX

### KNOWING PARTICIPATION IN A BREACH OF TRUST
(All Defendants)

67.     The allegations of paragraphs 1 through 66 are incorporated herein by reference.

68.     In purporting to act as commodities merchants, Baez and Sanchez, through the FIT Entities had a fiduciary duty to its customers and to the Plaintiffs. Sanchez and Baez, through the FIT Entities were in a position of superior knowledge and expertise to that of its customers who reposed their trust and confidence in the FIT Entities. This created a relationship of high trust and confidence whereby Baez and Sanchez, through the FIT Entities were entrusted with funds which customers deposited into the 65 Account.

69.     JPMorgan should have known that Baez and Sanchez through the FIT Entities were operating as an unregistered commodities merchant with authority over discretionary accounts, and in that capacity were using the accounts as fiduciary accounts. A reasonable inquiry to know its customer would have revealed the true purpose of the Enterprise, which is to launder monies internationally.

70.     In addition, since at least 2003, JPMorgan should have known, among other things, that Baez and Sanchez, through the FIT Entities were operating as a non-registered commodity merchant, as evinced by and that they were exercising discretion over their customer accounts. JPMorgan should have known that Baez and Sanchez, through the FIT Entities were breaching fiduciary duties by embezzling customer funds in the 65, 66 and other accounts. At a minimum, JPMorgan should have known by the volume and velocity of funds that flowed through them should have raised red flags as to suspicious transactions taking place within the 66

and 66 Accounts. This knowledge, which would have led a reasonably prudent person to suspect that Baez and Sanchez, through the FIT Entities were embezzling the funds of the Plaintiffs. JPMorgan failed to inquire whether Baez and Sanchez through the FIT Entities were embezzling those funds. A reasonable inquiry would have revealed that the only plausible explanations for the suspicious transactions were that FIT was embezzling customer funds in breach of their fiduciary duty. A reasonable inquiry would have revealed that 66 and 65 Accounts were being used outside of any known regular banking practices.

71.     JPMorgan knew or should have known and at a minimum consciously avoided such knowledge, that since at least 2003 the transactions taking place in the 65 and 66 Accounts did not coincide with any legitimate business purpose, and thus could only plausibly be explained by embezzlement and money laundering. JPMorgan should have been aware of the highly suspicious activity in the 65 and 66 Accounts by the utter absence of any investment activity with customer funds and the distribution of such funds to its customers. Large repetitive transactions, unrelated transfers to the purported business practice, frequent transactions with offshore entities, suspicious activity between the 65, 66 and other accounts to clients of JPMorgan, including the daughter of Baez, Maria Margarita Garzón Baez and large wire transfers to counties of criminal concern- should have alerted concerns of money laundering and JPMorgan's AML system. No later than 2005, JPMorgan's automated transaction monitoring system should have alerted JPMorgan to this unusual activity unless the system was overridden by one of its employees.

72.     JPMorgan should have been aware since at least 2005 that Baez and Sanchez through the FIT Entities hindered and delayed the production of information regarding their business to the CFTC or the NFA. This government body launched an investigation in that year

"which did not follow to any conclusions" despite voluminous evidence that Baez and Sanchez were clearly committing fraud and violated the commodities and Exchange Act. The CFTC has failed to answer a six-month old FOIA formal request made by Zamora.  After performing minimal due diligence on the FIT Entities, JPMorgan should have known that Baez and Sanchez were engaging in embezzlement and money laundering. Despite this knowledge, JPMorgan moved millions of dollars in and out of the accounts at the behest of Baez and Sanchez.  Baez and Sanchez through the FIT Entities and JPMorgan allowed Plaintiffs' funds to be used to make payments to the FIT Entities, to friends, family of the fraudsters, and to fund redemptions from other investors rather than make investments in the Forex market on behalf of customers. JPMorgan allowed Baez and Sanchez, through the FIT Entities to misappropriate millions of dollars from the accounts in breach of their duties as fiduciaries.

73.    JPMorgan is therefore liable for all funds Baez and Sanchez through the FIT Entities misappropriated funds from the 65, 66 and other Accounts after the point at which they knew or through reasonable inquiry would have known that Bacz and Sanchez through FIT Entities were embezzling those funds.

74.    As a result of JPMorgan's knowing participation in this breach of trust their actions resulted in a loss of approximately $150 million.

75.    As a direct and proximate result of JPMorgan's knowing participation in breach of trust, Plaintiffs and others lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT SEVEN

## AIDING AND ABETTING EMBEZZLEMENT
### (All Defendants)

76.    The allegations of paragraphs 1 through 75 are incorporated herein by reference.

77.     Baez and Sanchez through the FIT Entities committed a massive embezzlement scheme.  JPMorgan must have known or at a minimum consciously avoided knowledge of the scheme and provided substantial assistance to Baez, Sanchez and the FIT Entities in committing the scheme. At a minimum JPMorgan consciously avoided knowledge of the scheme by its lack of proper due diligence and fraud controls. Such lack of due diligence was simply criminally reckless. JPMorgan should have suspected an embezzlement and money laundering scheme and/or realized there was a high probability of one, but refrained from confirming it, arguably in order to later deny knowledge of the scheme and continue to collect fees. JPMorgan's actions proximately caused the scheme that resulted in millions of dollars in damages to customers and Plaintiffs.

78.     Plaintiffs bring this claim against all defendants because, upon information and belief, each defendant, individually, aided and abetted the embezzlement scheme. In addition, all of the defendants operated as a single, indivisible entity. Therefore, each of the defendants is liable for the actions of the other defendants.

79.     Baez and Sanchez, through the FIT Entities committed a multi-million dollar money laundering and embezzlement scheme. Sanchez and Baez told customers that their money would be invested in the Forex market, but instead stole that money and did not invest any of the customer funds as they promised. The money laundering and embezzlement scheme resulted in millions of dollars in loses to the clients and in an amount to be determined at trial.

80.     JPMorgan knew, or at a minimum consciously avoided knowledge of the embezzling scheme.  JPMorgan knew or should have known that since at least the 2005 the transactions taking place in the 65 and 66 Accounts did not coincide with any legitimate business enterprise and thus could only be plausibly explained by embezzlement and money laundering. JPMorgan was also aware or consciously avoided knowledge of highly suspicious activity in the

65 and the 66 Account, including large repetitive transactions, the volume and velocity of funds that flowed through the accounts, frequent transactions with offshore entities, known money laundering havens and suspicious activity between the 65 and the 66 and other accounts Plaintiffs accounts held at JPMorgan.

81.    JPMorgan knew or should have known or at a minimum, consciously avoided the easily attainable facts that since at least 2003 Baez and Sanchez, through the FIT Entities, submitted false and misleading information to the NFA and were not registered and violated the commodities and Exchange Act.

82.    Upon information and belief, after performing minimal or no due diligence on the FIT Entities, Baez and Sanchez, JPMorgan knew or should have known that Baez and Sanchez through the FIT Entities were embezzling Plaintiffs' monies. Since at least 2003, JPMorgan knew, should have known or at a minimum consciously avoided the fact that among other things, that there was a lack of transparency surrounding Baez, Sanchez and the FIT Entities. JPMorgan was criminally reckless in not knowing that none of the FIT Entities were registered with the NFA. This lack of diligence to comply with industry standards in criminally reckless.

83.    JPMorgan knew, should have known or was criminally reckless in not knowing that Baez and Sanchez through the FIT Entities were embezzling Plaintiffs' funds. At a minimum, JPMorgan was repeatedly faced with such evidence that there was a high probability of embezzlement, and made a conscious decision not to confirm such facts.

84.    JPMorgan through its employees substantially assisted Baez, Sanchez and the FIT Entities in committing embezzlement by funneling approximately $150 million in allowing the continued use the 65 and 66 Account to run the money laundering and embezzlement scheme.

JPMorgan granted access to the super highway of international commerce by executing transfers at their behest that were necessary for the operation of the money laundering and embezzlement scheme, choosing not to adequately execute its AML policy, which it touted to its customers, by effectively failing to provide an account sponsor to the 65 and the 66 Account and upon information ignoring instances of irregular activity in the 65 and 66 Accounts. These acts violated the Patriot Act.

85.     JPMorgan's assistance was a proximate cause of the money laundering and embezzlement scheme. Without JPMorgan's "seed of assistance", the scheme would not have been able to flourish and operate.

86.     As a result of the JPMorgan's aiding and abetting Baez and Sanchez through the FIT Entities, Plaintiffs lost millions of dollars. At a minimum, these actions resulted in a loss of approximately $150 Million to all victims. As a direct and proximate result of these activities, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT EIGHT

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against all Defendants)

87.     The allegations of paragraphs 1 through 86 are incorporated herein by reference.

88.     Baez, Sanchez and the FIT Entities owed a fiduciary duty to their clients. Baez, Sanchez and the FIT Entities breached that fiduciary duty by perpetrating a massive money laundering and embezzlement scheme through which they stole millions of dollars from their clients. JPMorgan knowingly participated in the breach, or at a minimum consciously avoided such knowledge by the gross failure in its AML process, causing harm to the Plaintiffs. At a minimum, JPMorgan consciously avoided knowledge of the breach.  Upon information and belief, JPMorgan suspected the Baez and Sanchez though the FIT Entities were breaching its

fiduciary duty and/or realized there was a high probability that they were breaching a fiduciary duty but refrained from ceasing it arguable in order to later deny knowledge of the breach.

89.    Plaintiffs bring this claim against all defendants because based upon information and belief, each defendant, individually, aided and abetted the breach of fiduciary duty by Sanchez and Baez, through the FIT Entities. In addition, all of the defendants operated as a single indivisible entity. Therefore, each of the defendants is liable for the actions of the other defendants.

90.    Baez and Sanchez, through the FIT Entities were in a fiduciary relationship with Plaintiffs and were in a superior position over clients' funds. This relationship required Plaintiffs to repose trust and confidence in Baez and Sanchez. In addition, pursuant to various account agreements Plaintiffs executed, Baez and Sanchez though the FIT Entities agreed to take customers money and invest it a Forex trading platform. Instead, Baez and Sanchez through the FIT entities embezzled by stealing their money and using it to benefit themselves, the FIT Entities and others too close to them.  The FIT Entities never made any trades or invested any of the money they received from their customers in the Forex market.  Baez and Sanchez, through the FIT Entities knew they owed a fiduciary duty to their clients and through the FIT Entities breached that duty. On information and belief, JPMorgan and/or its employees were aware or had a duty to become aware that none of the FIT Entities were a registered commodities merchant and should have reviewed account agreements in which they agreed to invest customer money pursuant to specific terms. JPMorgan also knew, or at least consciously avoided the knowledge that, Baez and Sanchez through the FIT Entities breached that fiduciary duty by engaging in embezzlement. JPMorgan knew or at a minimum consciously avoided such knowledge that since at least 2003, volume and velocity of the funds flowing through the 65 and

66 Account did not coincide with any legitimate business enterprise, and thus could only plausibly be explained by embezzlement. On information and belief, JPMorgan was aware or at a minimum consciously avoided the highly suspicious activity in the 65 and the 66 Account, including large repetitive transactions, frequent transactions with offshore entities, and the suspicious activity between the 65, the 66 Account and clients sub accounts of the private client small business segment at JPMorgan. No later than 2005, JPMorgan's automated transaction monitoring system should alert them this unusual activity.

91.     JPMorgan should have been aware that since at least 2003, Baez and Sanchez through the FIT Entities, submitted false information to the NFA. After performing minimal or no due diligence on Baez, Sanchez or the FIT Entities, JPMorgan should have known that they were engaged in embezzlement. Since at least 2005, JPMorgan knew, should have known or at a minimum consciously avoided the knowledge that there was a lack of transparency surrounding the FIT Entities. No later than 2003, JPMorgan was on notice that there was a substantial risk that Baez and Sanchez were embezzling customer monies. Since at least 2005, JPMorgan knew, among other things, that Sanchez and Baez refused to answer CFTC's questions regarding their business. JPMorgan knew or should have known that Baez and Sanchez through the FIT Entities were breaching their fiduciary duty to their clients. JPMorgan participated in and provided substantial assistance to the parties breaching its fiduciary duty by, and among other things, funneling approximately $150 million into the accounts, allowing the FIT Entities to use the 65 and the 66 Account to run the money laundering and embezzlement scheme, executing transfers at their behest that were necessary for operating the scheme, choosing not to execute its own AML policy, by effectively failing to provide an account sponsor to the 65 and the 66 Account, ignoring many instances of irregular activity in the 65 and the 66 Account, providing

unsupervised private bank accounts, ignoring false statements made by the FIT Entities as an unregistered commodities merchant and on information and belief, by not filing a Suspicious Activity Report ("SAR").

92.     JPMorgan's assistance was a proximate cause of the breach. Without the their assistance, Baez and Sanchez through the FIT Entities would not have been able to begin past the embryonic and continue to operate the money laundering and embezzlement scheme for nearly a decade. As a result of JPMorgan's aiding and abetting this breach of fiduciary duty, Plaintiffs lost millions of dollars. As a direct and proximate result of JPMorgan's activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT NINE

### CONVERSION
(Against all Defendants)

93.     The allegations of paragraphs 1 through 92 are incorporated herein by reference.

94.     JPMorgan exercised unauthorized dominion and control over funds that it knew, should have known or at a minimum consciously avoided such knowledge, that Baez and Sanchez through the FIT Entities held as a fiduciary on behalf of Plaintiffs, specifically identifiable customer property in derogation of Plaintiffs' rights. Plaintiffs have a possessory right and interest in the millions of dollars they invested with the FIT Entities, which was ultimately deposited at JPMorgan into the 65 and/or the 66 Account. These investment funds constitute customer property and are recoverable by the Plaintiffs.

95.     At the time JPMorgan debited the monies from the 66 Account to transfer to other accounts, comprised investor funds. Thus, JPMorgan's debit or transfer from the 65 or 66 Account has resulted in the wrongful conversion of customer property. Baez, Sanchez, through

the FIT Entities and JPMorgan are therefore liable for having wrongfully converted these monies and is now obligated to return all such monies to the Plaintiffs.

## COUNT TEN

### AIDING AND ABETTING CONVERSION
(Against JPMorgan)

96.    The allegations of paragraphs 1 through 95 are incorporated herein above by reference.

97.    The Plaintiffs have a legal right and interest in the millions of dollars they personally invested with Baez and Sanchez through the FIT Entities. The FIT Entities exercised unauthorized dominion and control over Plaintiffs property in derogation of customer rights by failing to invest the Plaintiffs property as promised. Instead, Baez and Sanchez through the FIT Entities used the Plaintiffs' money to make payments to friends, family and to fund redemptions to other investors and/or to Sanchez and Baez.  The unauthorized use of Plaintiffs' property resulted in the wrongful conversion of Plaintiffs' specifically identifiable escrow funds.

98.    JPMorgan had actual knowledge or at a minimum, consciously avoided such knowledge of the conversion and lent substantial assistance to Sanchez, Baez and the FIT Entities in converting these monies. JPMorgan should have suspected and even realized there was a high probability that Sanchez, Baez and/or the FIT Entities were converting Plaintiffs' money, but refrained from confirming its suspicions, upon information and belief, in order to later deny knowledge of the conversion. JPMorgan through its actions proximately caused the conversion that resulted in millions of dollars in damages to Plaintiffs.

99.    JPMorgan was aware, should have been aware or at a minimum was criminally reckless in failing to become aware that Sanchez, Baez and/or the FIT Entities were not broker

dealers, an investment adviser or commodities merchants and should have reviewed account agreements in which Sanchez, Baez and/or the FIT Entities agreed to invest customers' money pursuant to specific terms. Baez and Sanchez, through the FIT Entities converted millions of dollars of Plaintiffs' money and told its customers that they would invest their money, but instead embezzled that money and did not invest any of the funds as they claimed. JPMorgan also knew or should have known that Sanchez, Baez and/or the FIT Entities did not invest their money in the Forex market but instead embezzled Plaintiffs money. JPMorgan knew or should have known, that since at least 2005 that transactions taking place in the 65 and 66 Account did not coincide with any legitimate business investment and thus could only be explained by embezzlement and/or money laundering. JPMorgan was also aware or should have been aware of highly suspicious activity in the 65, 66 by the volume an velocity in the accounts and all affiliated accounts thereto, by recognizing that large, repetitive transactions, frequent transactions with offshore entities, and suspicious activity between the 65, the 66 Account and Plaintiffs sub-accounts could only be explained by fraud.   No later than January 2003, JPMorgan's automated transaction monitoring system should have alerted it to this unusual activity and its AML failure to do so is criminally reckless.

100.   After performing minimal or no due diligence on Sanchez, Baez and/or the FIT Entities, JPMorgan knew or should have known that Baez and Sanchez, through the FIT Entities were engaging in embezzlement, or at a minimum consciously avoided such knowledge. Since at least 2005, JPMorgan knew, among other things, that Baez and Sanchez did not want anyone to perform any due diligence on their business. JPMorgan did not known the names of the counterparties to the transactions they were purportedly entering into on their behalf, there was no independent verification of the Forex trades they were supposedly executing for its customers,

and were rumored to be running a money-laundering scheme or engaged in embezzlement. No later than 2003, JPMorgan should have been alerted by their AML program, that there was a substantial risk that Baez and Sanchez through the FIT Entities were embezzling and laundering customer funds.

101.    Upon information and belief, JPMorgan chose not to execute its AML policy which it touted to its customers, by effectively failing to provide an account sponsor to the 65 and the 66 Account, by ignoring instances of irregular activity in the 65 and 66 Account, by dismissing such alarms, by providing unsupervised private bank accounts to some of and/or FIT's customers, and by ignoring false statements made by Sanchez, and Baez. JPMorgan's assistance was a proximate cause of the conversion. Without it, Baez and Sanchez through the FIT Entities ,would not have been able to continue to operate the embezzling scheme.

102.    As a result of JPMorgan's aiding and abetting conversion, Plaintiffs lost millions of dollars. At a minimum, JPMorgan's reckless actions resulted in a loss of millions of dollars. As a direct and proximate result of JPMorgan's activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT ELEVEN

### UNJUST ENRICHMENT
(Against all Defendants)

103.    The allegations of paragraphs 1 through 102 are incorporated herein above by reference.

104.    JPMorgan has unjustly benefitted through its receipt of customer property that it acquired only as a result of perpetuating and participating in this money laundering and embezzlement scheme.

105.    Since 2003, JPMorgan received fees from the FIT Entities.  JPMorgan also benefitted from customer property by receiving deposits of this property into the 65 and 66 Account.  JPMorgan kept the 65 and the 66 Account open until 2009 and used the balance in the 65 and 66 Account to earn fees and profits.

106.    JPMorgan earned these benefits at the expense of the Plaintiffs and cannot unjustly retain them. Faced with the prospect of losing fees and profits, upon information and belief, JPMorgan chose to ignore compelling evidence of the embezzling and laundering scheme. JPMorgan was privy to the abnormal activity in the 65 and 66 Account, suspicious and inadequate information received from Baez and Sanchez and a plethora of other evidence of embezzling as detailed herein. JPMorgan helped perpetuate the embezzlement by ignoring the evidence of embezzlement and continuing to use the customer property in the 65 and 66 Account for its own enrichment.

107.    Equity requires full restitution of the monies received by JPMorgan, directly and indirectly from the defendants. This includes not only the customer property JPMorgan received directly from Baez and Sanchez through the FIT Entities, but also any profits made from its use of this money. Additionally, any profits and fees JPMorgan earned through its use of the Plaintiffs property deposited in the 65 and the 66 Account is recoverable by the Plaintiffs as restitution.

108.    JPMorgan proximately caused the loss to the Plaintiffs. JPMorgan's AML should have alerted them to the scheme and this failure to expose the scheme to regulators would lead to the collapse of the scheme. By its own action, in failure to report information to regulators resulted in massive losses for customers and Plaintiffs.

109.    As a result of JPMorgan's lack of reporting Baez and Sanchez to federal and state regulators, Plaintiffs and other investors lost millions of dollars. At a minimum,  JPMorgan's

actions resulted in a loss of approximately $150 million dollars. As a direct and proximate result of JPMorgan's activities, Plaintiffs lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT TWELVE

### BREACH OF FIDUCIARY DUTY
(Against all Defendants)

110. The allegations of paragraphs 1 through 109 are incorporated herein by reference.

111. JPMorgan knew or should have known that the 65 and the 66 Account held fiduciary funds entrusted by investors. JPMorgan knew or should have known that fiduciary funds entrusted to Baez and Sanchez, through the FIT Entities in the 65 and 66 Account were being misappropriated. JPMorgan benefited from the illegal scheme.

112. In these circumstances, JPMorgan arguably owed a fiduciary duty to Plaintiffs to prevent further misappropriation of funds in Plaintiffs escrow accounts, which JPMorgan knew, should have know, or were criminally reckless in that it had been entrusted to Baez and Sanchez. JPMorgan breached its fiduciary duty by failing to maintain its "special relationship" to Plaintiffs by failing to act to safeguard escrow funds it knew or were criminally reckless in not obtaining the knowledge had been entrusted through Plaintiffs escrow sub-accounts after receiving clear evidence of misappropriation thereof by Baez and Sanchez through the FIT Entities.

113. As a direct and proximate result of JPMorgan's breach of fiduciary duty, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT THIRTEEN

### COMMERCIAL BAD FAITH
(Against JPMorgan)

114. The allegations of paragraphs 1 through 113 are incorporated herein above by reference.

115.    JPMorgan knew or should have known had the facts and circumstances of the illegitimate scheme by Baez and Sanchez though the FIT Entities or at a minimum consciously avoided such knowledge and therefore is criminally reckless in that regard.

116.    JPMorgan acted in commercial bad faith by facilitating the scheme by continuing to provide banking services to Baez and Sanchez through the FIT Entities without any meaningful investigation and through the gross failure of its AML program.

117.    As a direct and proximate result of JPMorgan's actions in commercial bad faith, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT FOURTEEN

### GROSS NEGLIGENCE
(Against all Defendants)

118.    The allegations of paragraphs 1 through 117 are incorporated herein above by reference.

119.    Based upon the assertion that JPMorgan should have had actual knowledge of the facts and circumstances of the illegal scheme, JPMorgan had a duty thoroughly to investigate under prudent business practices and when it failed to receive credible explanations from Baez and Sanchez of its business legitimacy, JPMorgan should have closed the 65 and the 66 Account.

120.    JPMorgan's failure to thoroughly to investigate Baez, Sanchez and the FIT Entities and to close the 65 and 66 Account, was in the circumstances grossly negligent.

121.    As a direct and proximate result of JPMorgan's gross negligence, Plaintiffs lost their investment capital and suffered damages in an amount to be proven at trial.

## COUNT FIFTEEN

### FRAUD
(Against Sanchez, Baez and FIT Entities)

122.    The allegations of paragraphs 1 through 121 are incorporated herein above by

reference.

123.   Sanchez, Baez made false statements to clients in order to solicit their investments. They falsely represented that FIT International Group was a New York corporation. FIT International Group had never been incorporated in New York or any other state. FIT International Group was merely a fraudulent artifice created to avoid detection. Sanchez, Baez and falsely represented that FIT international Group "has all of the applicable required government approvals, licenses, and permits, including but not limited to, if applicable, registration with the NFA as a commodity trader advisor." Neither FIT International Group nor any other entity had any proper license or government approval to solicit or invest client funds. In addition, Sanchez and Baez, directly and through FIT New York and other corporate instrumentalities, falsely claimed that customer accounts will have trades executed via the FIT account and FIT trading lines and the automated FIT trading system will distribute profits and losses accordingly to all customers. No trades were executed as represented.

124. Baez and Sanchez produced false and misleading client account statements, purporting to show trades and profits, with stable consistent returns over a sustained period of time regardless of volatility in the market. Such statements were a lie. Baez and Sanchez had not traded in currency and in amounts they had claimed, but were merely stealing money from clients for their own personal benefit and use. Baez, Sanchez through the FIT Entities had actual knowledge that such statements were false when stated and made such statements intentionally so that clients would detrimentally rely upon them. All of these false representations are material and were reasonably, justifiably relied upon by Plaintiffs in deciding to invest and maintain their investments. As a direct and proximate cause of intentionally and materially false statements, Plaintiffs suffered damages in an amount to be found by trial.

## COUNT SIXTEEN

## AIDING AND ABETTING FRAUD

(Against JPMorgan)

125.    The allegations of paragraphs 1 through 124 are incorporated herein above by reference.

126.    As described more fully herein, Baez and Sanchez through the FIT Entities were operating a scheme to defraud investors with the assistance of JPMorgan, JPMorgan employees and others known and unknown.

127.    At all times material thereto, JPMorgan officers and representatives named throughout this Complaint were acting within the scope of their employment.

128.    JPMorgan knew, should have known or at a minimum was criminally reckless in consciously avoiding the knowledge of the money laundering and embezzlement scheme.

129.    Upon information and belief, JPMorgan actively provided substantial assistance to Baez and Sanchez in their financial exploitation of Plaintiffs through fraud. As more fully described throughout this Complaint, JPMorgan's assistance included, but was not limited to, providing Baez and Sanchez, through the FIT Entities with numerous bank accounts to use during the course of the scheme coupled with the knowledge that the accounts on their face were opened with the intent to defraud.

130.    JPMorgan, through their deliberately fostered ignorance, directly caused injury and damage to the Plaintiffs and other victims. JPMorgan deliberately closed its eyes to what would otherwise have been obvious if their AML program was implemented appropriately. JPMorgan is therefore criminal negligent and its knowledge should be inferred. JPMorgan

"deliberately blinded itself" to the assistance of  Yolanda Santiago-Hasbu and the bank to provide banking services for international money launders. JPMorgan deliberately closed his eyes to what otherwise would have been obvious. In very concise terms, JPMorgan consciously avoided looking at readily attainable facts that were glaring, this avoidance is the equivalent of knowledge. JPMorgan deliberately hid and escaped responsibility for the fraud and this concept is the law of conscious avoidance.  JPMorgan failed through their AML program to detect the fraud, or detected the fraud but chose not to report it to state regulators when they had a duty to learn certain information about their terrorist clients. That deliberate failure to learn such information or non-disclosure is the equivalent of actual knowledge. JPMorgan can't escape responsibility for deliberately shutting their eyes to the fraud which would have told them the facts, that Baez and Sanchez were running a money laundering scheme to promote Columbian terrorism.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding compensatory and/or consequential damages and as permitted by law exemplary and punitive damages in favor of the plaintiffs against all defendants, jointly and severally for all damages sustained as a result of defendant's wrongdoings in specific amounts of compensatory, exemplary and punitive damages to be determined at trial, including interest and any enhanced damages thereon;

B.    Awarding Plaintiffs restitution of monies JPMorgan received from Baez, Sanchez and/or the FIT Entities and any profits earned through JPMorgan use of these monies;

C.    Establishment of a constructive trust over the proceeds of unjust enrichment of JPMorgan in favor of the plaintiffs;

D.      Award plaintiffs its reasonable costs, interest and counsel and expert fees incurred; and

E.      Such other and further relief as this Court may deem just, proper and necessary.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: July 16, 2014                    By:    _____

                                               DAVID BELLON (DB1970)
                                               48 Willoughby Street
                                               Brooklyn, New York 11201
                                               T: 347.642.5743
                                               F: 718.532.9682
                                               Attorney for the Plaintiffs